Opinion issued October 11, 2016



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00044-CV

———————————

**TMX FINANCE HOLDINGS, INC., Appellant**

**V.**

**WELLSHIRE FINANCIAL SERVICES, LLC D/B/A LOANSTAR TITLE LOANS D/B/A MONEYMAX TITLE LOANS AND D/B/A LOANMAX; MEADOWWOOD FINANCIAL SERVICES, LLC D/B/A LOANSTAR TITLE LOANS AND D/B/A MONEYMAX TITLE LOANS; AND INTEGRITY TEXAS FUNDING, LP, Appellees**

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2013-33584

**O P I N I O N**

TMX Finance Holdings, Inc. (TMX-Holdings), an out-of-state holding company, appeals the denial of its special appearance. The trial court denied the special appearance based on its finding that TMX-Holdings was an alter ego of a related entity—also a holding company—that had submitted to the court's jurisdiction.

In two issues, TMX-Holdings argues that an alter-ego theory cannot support the trial court's ruling because the plaintiffs failed to allege that theory in their pleadings and, to the extent the plaintiffs are permitted to assert an alter-ego theory, they failed to meet their burden to prove alter ego as a basis to deny TMX-Holdings's special appearance.

We reverse the trial court's order denying the special appearance and render judgment of dismissal of all claims against TMX-Holdings.

**Background**

This is a suit between competitors in the automobile title lending business.[1] When the suit began, there were three named plaintiff entities—all of which are

---

[1] Portions of the record were filed under seal following a Rule 76a sealing order in the trial court. TEX. R. CIV. P. 76a. Because of the sealing order, some of our references to the record are deliberately vague. *See Kartsotis v. Bloch*, No. 05-14-01294-CV, 2016 WL 4582208, at *1 (Tex. App.—Dallas Sept. 2, 2016, no pet. h.) (noting that some references in opinion are "deliberately vague" because of sealing order). Nonetheless, we have responsibilities to the public as an appellate court to resolve disputes through public opinions that explain our decisions based on the record. *See* TEX. R. APP. P. 47.3 ("All opinions of the courts of appeals are open to

related—that were suing four named defendant entities—all of which are related—and two individual defendants. The original named plaintiffs were (1) Wellshire Financial Services, LLC d/b/a LoanStar Title Loans d/b/a MoneyMax Title Loans and d/b/a LoanMax, (2) Meadowwood Financial Services, LLC d/b/a LoanStar Title Loans and d/b/a MoneyMax Title Loans, and (3) Integrity Texas Funding, LP (collectively, "Wellshire").

The original named defendants were (1) TMX-Holdings; (2) its subsidiary, which is also a holding company, TMX Finance, LLC (TMX-Finance); (3) TitleMax of Texas, Inc., which is a credit service subsidiary of TMX-Finance; (4) TMX Finance of Texas, Inc., another credit service subsidiary of TMX-Finance; (5) Felix Deleon, individually, and (6) Ishmael Hernandez, individually (collectively, "the TMX entities"). Other than TMX-Holdings, the TMX entities did not contest the court's jurisdiction over them. Wellshire did not sue Tracy Young, the individual it alleges exerts control over both TMX-Holdings and TMX-Finance.

---

the public and must be made available . . . ."). To the extent we include any sensitive information in this memorandum opinion, we do so only to the degree necessary to strike a fair balance between the parties' interest in keeping portions of the record confidential and our responsibilities to the public as an appellate court. *See R.V.K. v. L.L.K.*, 103 S.W.3d 612, 614–15 (Tex. App.—San Antonio 2003, no pet.) (attempting to "strike a fair balance" between parties' interest in keeping sealed portion of record confidential and court's and public's interest in court fulfilling its responsibilities); *Mi Gwang Contact Lens Co., Ltd. v. Chapa*, No. 13-13-00306-CV, 2015 WL 3637846, at *6–7 (Tex. App.—Corpus Christi June 11, 2015, no pet.) (mem. op.) (same).

Wellshire alleged, in its original petition, that the TMX entities "surreptitiously targeted and collected the license plate numbers of customers in [its] parking lot, using that information to perform impermissible searches for customers' personal information" as part of a business-development plan to contact and solicit Wellshire's customers. Wellshire sued the TMX entities for misappropriation of trade secrets and tortious interference with existing contracts and prospective business relations.

Regarding jurisdiction, Wellshire alleged that the trial court had jurisdiction over TMX-Holdings because it purposefully availed itself of the privileges and benefits of conducting business in Texas. Wellshire pleaded joint and several liability on its claims.

In its special appearance, TMX-Holdings asserted that it has never conducted any business activities in Texas. It also asserted that it has no employees, operations, or revenue, and thus, no contacts with Texas. TMX-Holdings issues no paychecks, pays no income taxes, and is not registered to do business in this or any other state.[2] As TMX-Holdings explained it, its owners "formed [the entity] merely to facilitate more efficient estate planning and tax reporting for [themselves]."

---

[2] The TMX-Holdings officer deposed as its corporate representative, Christopher Kelly Wall, testified that he did not receive a paycheck or any income from TMX-Holdings.

4

Wellshire responded by arguing that TMX-Holdings is the alter ego of TMX-Finance and the two entities "lack [ ] any meaningful separation," "have acted as a single entity," and have "ignored all corporate formalities" in their dealings. And, according to Wellshire, because TMX-Finance is subject to jurisdiction, so is its alter ego, TMX-Holdings.

TMX-Holdings responded by specifically denying that it is subject to the jurisdiction of a Texas court under an alter-ego theory and asserting, instead, that it is a "separate and distinct" entity from the other TMX entities identified in the suit. According to TMX-Holdings, it is a mere holding company without any employees or operations and, due to its limited role, does not exert authority over any of the codefendant entities' policies or operations. TMX-Holdings included an affidavit from one of its two officers, its vice president, Christopher Kelly Wall, supporting these statements.

The trial court denied TMX-Holdings's special appearance. TMX-Holdings filed an interlocutory appeal from that order.

### TMX-Holdings's Contention that Wellshire Waived its Alter-Ego Argument

Before addressing the merits of TMX-Holdings's jurisdictional argument, we first consider its contention that Wellshire waived its alter-ego theory of personal jurisdiction by including it only in the special appearance response and not in its live

5

petition and, as a result, the trial court's order denying the special appearance on alter-ego grounds was in error.

The Texas Rules of Civil Procedure do not limit a trial court's review of a special appearance to considering only the plaintiff's petition. On the contrary, Rule 120a identifies multiple items a trial court may consider when ruling on a special appearance: "The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3). The plaintiff's "pleadings" are not limited to those in which it originally asserted that the defendant is subject to personal jurisdiction in the forum: "The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden" to establish the necessary jurisdictional facts. *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see Henkel v. Emjo Invs., Ltd.*, 480 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (rejecting argument that court confines its consideration to jurisdictional facts contained in original petition and, instead, considering plaintiff's response to defendant's special appearance to determine if plaintiff satisfied its burden to allege jurisdictional facts).

We conclude that the trial court did not err by considering Wellshire's response when it ruled on TMX-Holdings's special appearance. *See Henkel*, 480 S.W.3d at 7. We overrule TMX-Holdings's first issue and turn next to the merits of the special appearance.

## Special Appearance

In its second issue, TMX-Holdings argues that the trial court erred by denying its special appearance because Wellshire did not overcome the presumption of corporate separateness to establish personal jurisdiction under an alter-ego theory.

### A. Standard of review

Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law, and we review de novo a trial court's ruling on a special appearance to challenge personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). "When [as here] a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied." *Id.* (quoting *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency . . . ." *BMC*, 83 S.W.3d at 795.

**B.** **General law on minimum contacts to support personal jurisdiction**

A nonresident defendant is subject to personal jurisdiction in Texas if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate the due process guarantees of the federal and state constitutions. *Kelly*, 301 S.W.3d at 657. The Texas long-arm statute allows the exercise of personal jurisdiction to "reach as far as the federal constitutional requirements of due process will allow." *Id.* (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)).

The exercise of personal jurisdiction is consistent with due process "when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *Id.* (quoting *Moki Mac*, 221 S.W.3d at 575). "A defendant establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)).

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. *Kelly*, 301 S.W.3d at 658. The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the

reach of the long-arm statute. *Id.*; *Retamco Operating*, 278 S.W.3d at 337. Once the plaintiff pleads sufficient jurisdictional allegations, the defendant seeking to avoid personal jurisdiction bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *Kelly*, 301 S.W.3d at 658. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.*

If the plaintiff fails to plead facts bringing the defendant within the reach of the long-arm statute, the defendant need only prove that it does not reside in Texas to negate jurisdiction. *Id.* at 658–59. The Texas Supreme Court has held that a defendant can negate jurisdiction on either a factual or legal basis:

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.*

After the defendant negates the plaintiff's jurisdictional allegations, the plaintiff must respond with evidence "establishing the requisite link with Texas." *Id.* at 660. "Once the defendant has produced credible evidence negating all bases of

9

jurisdiction, the plaintiff bears the ultimate burden to establish that the Texas court has personal jurisdiction over the defendant as a matter of law." *Vak v. Net Matrix Sols., Inc.*, 442 S.W.3d 553, 558 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 (Tex. App.—Corpus Christi 1999, no pet.)); *Oryx Capital Int'l, Inc. v. Sage Apartments, L.L.C.*, 167 S.W.3d 432, 441 (Tex. App.—San Antonio 2005, no pet.) ("If the defendant produces evidence negating jurisdiction, the burden returns to the plaintiff to show as a matter of law that the court has jurisdiction over the defendant.").

## C.      Specific law on personal jurisdiction based on alter-ego status

When a plaintiff sues two related corporations, the law presumes that the two are distinct corporations. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). When one of the defendants is a subsidiary of the other, the subsidiary's in-state activities are not imputed to the out-of-state parent if "the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent and is not acting as merely one of its departments . . . ." 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.4 (4th ed. 2016); *Weatherford Artificial Lift Sys., Inc. v. A & E Sys. SDN BHD*, 470 S.W.3d 604, 611 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (applying standard). The independence inquiry examines whether "the parent corporation exerts such

domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities"; if it does, and the subsidiary is subject to personal jurisdiction in Texas, then, for jurisdictional purposes, the parent will be considered the alter ego of the subsidiary and personal jurisdiction will attach. *See PHC-Minden*, 235 S.W.3d at 173.

When a plaintiff asserts jurisdiction over a nonresident defendant under an alter-ego theory, the plaintiff has the burden to overcome the presumption of separateness by proving its alter-ego allegation. *BMC*, 83 S.W.3d at 798 ("[T]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation."); *see Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 418 (Tex. App.—Houston [14th Dist.] 1997, no writ) (stating that burden is on plaintiff to prove existence of alter-ego relationship). To prove alter ego and "fuse" these two entities for jurisdictional purposes, the plaintiff must establish that the foreign parent exercised a degree of control over the subsidiary that is "greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *BMC*, 83 S.W.3d at 799.

Our Supreme Court has identified four factors relevant to whether a parent entity exercises a greater-than-normal degree of control over its subsidiary: (1) the

11

amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *PHC–Minden*, 235 S.W.3d at 175. The first three factors evaluate whether corporate structure is such that excessive control could occur, while the fourth measures actual control. Thus, the fourth factor is most closely aligned with the ultimate question the factors address: actual control. *See id.* at 173 ("The rationale for exercising jurisdiction is that the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.") (internal quotations and citations omitted); *see id.* at 176.

Evidence relevant to the first factor—common ownership—even when combined with common corporate officers, does not demonstrate that a parent and subsidiary are alter egos. *PHC-Minden*, 235 S.W.3d at 175; *BMC*, 83 S.W.3d at 799; *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975). Likewise, evidence of the second factor—shared office space—is insufficient without more. *See All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 423 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Common ownership and shared headquarters are not enough because these factors merely present circumstances that could lead to parental control over the subsidiary, without indicating whether actual

12

control was exercised. *See id.* (noting that common stock ownership and shared office space and employees are insufficient to support jurisdictional veil-piercing absent evidence that one entity "exercised meaningful, much less 'complete,' control" over the other entity's "daily activities") (quoting *U.S. LED, Ltd. v. Nu Power Assocs., Inc.*, No. H-07-0783, 2008 WL 4838851, at *6 (S.D. Tex. Nov. 5, 2008) (slip op.)); *Conner*, 944 S.W.2d at 419–20 (concluding that parent and subsidiary are not alter egos even though they "maintain significant ties" because they operate with level of independence such that corporate separation is not "pure fiction"). Nor is it enough to show parental involvement in the subsidiary's activities typical of an investor. *PHC-Minden*, 235 S.W.3d at 176. Thus, a parent will not be considered an alter ego of a subsidiary even if it monitors the subsidiary's performance, supervises its finance and capital budget decisions, and articulates general policies for the subsidiary. *Id.*

Instead, the plaintiff must show something more—a "plus factor" "beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *see Dickson Marine*, 179 F.3d at 338 ("Invariably such clear evidence requires an additional or a 'plus' factor . . . . There must be evidence of one corporation asserting sufficient control . . . ."). It is this plus factor that converts, for jurisdictional purposes, the typical parent-subsidiary relationship—which involves common

13

ownership, monitoring, reporting, and articulating of general policies—into an alter-ego relationship. *PHC-Minden*, 235 S.W.3d at 176; *cf. All Star*, 298 S.W.3d at 422 (stating that four *PHC-Minden* factors "are not of uniform significance"). As the Texas Supreme Court has explained, the level of actual control over the subsidiary must rise to the level to be "abnormal" or "atypical." *BMC*, 83 S.W.3d at 798, 800; *PHC-Minden*, 235 S.W.3d at 176.

**D.     Whether TMX-Holding exercised an abnormal degree of control over TMX-Finance**

Wellshire asserts that TMX-Holding "completely controls" TMX-Finance. As proof of that assertion, Wellshire points to statements in TMX-Finance's Form 10-K. After explaining that TMX-Finance is a limited liability company that exists solely as a holding company to own the equity interests of its subsidiaries and that its former sole member, Tracy Young, transferred 100% of his membership interests to TMX-Holdings in exchange for shares of TMX-Holdings, the TMX-Finance annual report states:

> Tracy Young is our founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of our parent holding company, [TMX-Holdings]. As a result . . . Mr. Young has the ability to control substantially all matters of significance to the Company, including the strategic direction of our business . . . regardless of whether the holders of senior secured notes, or our "bondholders," believe that any such action is in their best interests.

> As a result of Mr. Young's complete beneficial ownership and control of our Company, his interests could conflict with the interests of our bondholders.

14

Wellshire asserts that this language demonstrates TMX-Holdings's control over TMX-Finance. There are at least two problems with Wellshire's interpretation. First, the Form 10-K states that Tracy Young—not TMX-Holdings—is the party with control. Wellshire sued various TMX-related entities and two individuals, but it did not sue Young. Wellshire has not argued that TMX-Finance or TMX-Holdings is the alter ego of Young. Instead, Wellshire argues that TMX-Holdings is the alter ego of TMX-Finance. The Form 10-K does not support Wellshire's argument that TMX-Holdings controls TMX-Finance.[3]

---

[3] That Wellshire did not argue that Young was the alter ego of these entities distinguishes this case from *Cappuccitti v. Gulf Indus. Prod., Inc.*, 222 S.W.3d 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.). There, the appellate court concluded that an individual, a parent company, and a subsidiary were alter egos of one another and that the trial court had personal jurisdiction over all three. *Id.* at 484. Cappuccitti, who was not a Texas resident, incorporated two Bahamian corporations. He owned 100% of the parent company, and the parent company owned 90% of the subsidiary. *Id.* at 482. The subsidiary entered into a contract with a Texas corporation. *Id.* at 475. The Texas corporation ultimately terminated the contract for non-performance and sued the subsidiary, its parent company, and Cappuccitti. *Id.* at 475–78. Cappuccitti and the parent company filed special appearances, which were denied. *Id.* at 473. The appellate court affirmed, concluding that the plaintiff presented sufficient proof to pierce the corporate veil for jurisdictional purposes. *Id.* at 484. The appellate court cited as supporting evidence that Cappuccitti was the president of both corporations, the only employee of the parent corporation, and one of only two employees of the subsidiary; both companies operated out of Cappuccitti's home; the subsidiary company paid Cappuccitti $10,000 per month as a consultant; Cappuccitti negotiated with the Texas-based manufacturer to grant rights of first refusal to both companies; on at least one occasion, Cappuccitti paid the subsidiary's bills with a check drawn from his personal account; and Cappuccitti, the subsidiary, and the parent company were

Second, the Form 10-K discloses only that Young "*has the ability to control*" TMX-Finance. As stated above, although Young's common ownership of TMX-Holdings and TMX-Finance permits the possibility of control, it does not—without more—establish alter ego because it provides no evidence of actual control of TMX-Finance by TMX-Holdings to a degree that is abnormal or atypical. *See PHC-Minden*, 235 S.W.3d at 175; *BMC*, 83 S.W.3d at 799; *Gentry*, 528 S.W.2d at 573.

Wellshire argues that TMX-Holdings controls "each and every aspect of TMX Finance's operations," but the evidence, through the deposition of TMX-Holdings's vice president, Wall, reflects that TMX-Holdings has no involvement in TMX-Finance's operations, marketing efforts, personnel decisions, or internal policies and procedures. Wellshire has presented no evidence to the contrary. TMX-Holdings receives annual reports concerning TMX-Finance's business, but that is entirely consistent with TMX-Holdings's status as owner of TMX-Finance's membership interests and constitutes "appropriate parental involvement." *See PHC-Minden*, 235 S.W.3d at 176 ("Appropriate parental involvement includes monitoring the

_____

used interchangeably to transfer assets from one to the other, which rendered the subsidiary insolvent. *Id.* at 482–84. Here, by contrast, there is no evidence of deliberate undercapitalization to defraud an insolvent subsidiary's creditors or payment of a subsidiary's bills from a personal account. Nor is the individual who allegedly controls the entities a named defendant.

16

subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies.").

Wellshire points to a single, substantial contribution TMX-Holdings made to TMX-Finance. But a parent corporation's infusion of capital to its subsidiary, which in itself does not harm creditors or other third parties dealing with the subsidiary or cause some other injustice to third parties, is insufficient to confer personal jurisdiction over an out-of-state parent entity. *See Conner*, 944 S.W.2d at 419 (rejecting contention that parent entity was alter ego of its subsidiary when entities had "significant ties" and subsidiary received its initial capital from parent).

Wellshire also points to evidence that TMX–Finance's tax department prepared annual financial statements for TMX-Holdings without TMX-Holdings paying for those services. Yet reports from a subsidiary to a parent that allow a parent to monitor its operations are insufficient to treat two separate entities as one entity. *PHC-Minden*, 235 S.W.3d at 176; *cf. SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454–56 (Tex. 2009) (stating, in rejecting single-business enterprise doctrine, that affiliated entities that "coordinate their activities" and "pursu[e] common goals" are "commonplace" and holding that "abuse" is required to disregard the corporate separateness of two related entities).

Additionally, Wellshire maintains that the two entities have not complied with all corporate formalities. For example, both entities list the same business address as

their headquarters, yet there is no evidence that either pays rent to the other. There is also an undocumented, non-contractual financial liability TMX-Holdings has to TMX-Finance. Further, there is evidence that TMX-Holdings has never had any directors, despite being required by Delaware law to have at least one. While these facts may indicate a dereliction of some corporate formalities, there is evidence that other corporate formalities have been observed. For example, Wall averred that TMX-Holdings "maintains separate corporate accounts and a separate bank account; does not commingle assets; does not share business departments; [and] has its own financial statements." This evidence is mixed regarding observance of corporate formalities, but the mixed character does not strongly suggest that their corporate separateness is "pure fiction." *See PHC-Minden*, 235 S.W.3d at 176 (with evidence of some corporate formalities observed and others not, concluding that corporate separation was not "pure fiction"). Further, each of the two distinct entities meets regularly to discuss the business of that entity apart from the other, which counsels against an alter-ego finding. *See BMC*, 83 S.W.3d at 798; *cf. PHC-Minden*, 235 S.W.3d at 176 (courts should consider all relevant facts and circumstances surrounding operations of parent and subsidiary to determine whether two separate and distinct corporate entities exist).

In any event, we decline to conclude that the failure to follow corporate formalities, particularly for this family-held group of entities, is sufficient, in itself

18

to demonstrate that the two entities are one. *Cf.* TEX. BUS. ORGS. CODE ANN. § 21.730(1) (stating that, for liability purposes, failure to follow corporate formalities for a closely held corporation is not "a factor" in determining whether to disregard the corporate status); *Id.* § 21.223 (stating that corporate separateness may not be disregarded "on the basis of the failure of the corporation to observe any corporate formality"); *Hoffmann v. Dandurand*, 180 S.W.3d 340, 347 (Tex. App.—Dallas 2005, no pet.) (stating that "[f]ailure to comply with corporate formalities is no longer a factor in considering whether alter ego exists" for liability purposes); *Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n,* 77 S.W.3d 487, 499 (Tex. App.—Texarkana 2002, pet. denied) (same); *cf. also El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V.*, 82 S.W.3d 622, 634 (Tex. App.—Corpus Christi 2002, pet. dism'd w.o.j.) (noting that jurisdictional veil-piercing involves different analysis than that used when "determining whether separate corporate entities should be treated as one for liability purposes").

As the party seeking to impute TMX-Finance's contacts with Texas to TMX-Holdings through an alter-ego theory of personal jurisdiction, Wellshire bears the burden of establishing that TMX-Holdings "controls the internal business operations and affairs of" TMX-Finance and that the degree of control TMX-Holdings actually exercises is "greater than that normally associated with common ownership and directorship" such that "the two entities cease to be separate so that the corporate

19

fiction should be disregarded to prevent fraud or injustice." *PHC-Minden*, 235 S.W.3d at 175. Wellshire has not presented evidence that TMX-Holdings exercises atypical control over "the internal business operations and affairs" of TMX-Finance to subject it to personal jurisdiction in Texas courts based on TMX-Finance's contacts. Accordingly, Wellshire fails, as a matter of law, to overcome the presumption of separateness to prove alter ego. *See BMC*, 83 S.W.3d at 799 (noting that there must be degree of control "greater than that normally associated with common ownership and directorship" for alter-ego based jurisdiction); *All Star*, 298 S.W.3d at 423 (requiring evidence of greater-than-normal control).

## E. Role of inferred facts in support of judgment

Wellshire argues that, under the applicable standard of review, we must read into the trial court's order denying TMX-Holdings's special appearance various implied facts, including that TMX-Holdings actually exercised abnormal control over TMX-Finance and, as long as there is more than a scintilla of evidence in support of that implied finding, we may not reverse and render judgment in TMX-Holding's favor.

Wellshire overstates the role of implied findings. Our Supreme Court stated, in *BMC*, that, "[w]hen a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and *supported by the evidence* are implied." 83 S.W.3d at 795 (emphasis added); *see*

20

*Lockhart v. Garner*, 298 S.W.2d 108, 110 (Tex. 1957) ("[I]f the evidence on the issue raised a fact issue, although the trial court made no findings of fact, we may infer [facts] in favor of the validity of the judgment . . . ."). We have already concluded that there is no evidence that TMX-Holdings exercised actual atypical or abnormal control over TMX-Finance. Accordingly, we do not imply a factual finding that such control was exercised.

We conclude that, based on this record, Wellshire has not established that TMX-Holdings controls the internal operations of TMX-Finance to such an extent that the entities have ceased to be separate, justifying the imputing of TMX-Finance's consent to jurisdiction in Texas to TMX-Holdings. We therefore hold that the trial court erred in denying TMX-Holdings's special appearance on alter-ego grounds.

We sustain TMX-Holdings's second issue.

## Conclusion

Because the alter-ego theory was the only basis for personal jurisdiction asserted by Wellshire and we have concluded that TMX-Holdings is not an alter ego of TMX-Finance, we reverse the order of the trial court denying TMX-Holdings's

21

special appearance and render judgment dismissing TMX-Holdings from the underlying litigation.

                                        Harvey Brown
                                        Justice

Panel consists of Justices Keyes, Brown, and Huddle.