**Affirmed in Part, Reversed and Rendered in Part, and Opinion filed April 30, 2024.**



In the

# Fourteenth Court of Appeals

---

**NO. 14-23-00202-CV**
**NO. 14-23-00203-CV**

---

**AMNEAL PHARMACEUTICALS, INC., AND AMNEAL PHARMACEUTICALS LLC, Appellants**

**V.**

**COUNTY OF DALLAS, Appellee**

and

**AMNEAL PHARMACEUTICALS, INC., AND AMNEAL PHARMACEUTICALS LLC, Appellants**

**V.**

**COUNTY OF BEXAR, Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 2018-77098 and 2018-77066**

---

# O P I N I O N

In separate actions, two Texas counties sued multiple companies that allegedly manufacture, distribute, or sell opioids. Non-resident drug manufacturer Amneal Pharmaceuticals, LLC, (Amneal) and holding company Amneal Pharmaceuticals, Inc., (API) have appealed the denial of their special appearances, and we consider the cases together. We conclude that Amneal's Texas contacts satisfy the requirements of the "stream-of-commerce-plus" test for purposeful availment and the Counties' claims are related to those contacts. Litigating those claims in Texas comports with traditional notions of fair play and substantial justice. On the other hand, API lacks Texas contacts of its own, and the Counties failed to show that API is Amneal's alter ego so as to impute Amneal's contacts to it. Thus, we affirm the denial of Amneal's special appearance, reverse the denial of API's special appearance, and render judgment dismissing API without prejudice.

## I. BACKGROUND

Dallas County and Bexar County sued a number of companies in the pharmaceutical industry for allegedly oversupplying opioids, directly or indirectly increasing the demand for them, and failing to maintain effective controls against diversion, thereby creating a public-health crisis. The Counties assert claims that the defendants negligently or intentionally created a public nuisance; committed common-law fraud, negligence, and gross negligence; violated the Texas Controlled Substances Act; and participated in a civil conspiracy.

Defendants Amneal and API (the Amneal Parties) are both Delaware companies with their respective principal places of business in New Jersey. Each filed verified special appearances in the cases, and the Counties filed a joint response to each. The trial court denied the special appearances, and Amneal and API brought these interlocutory appeals.

2

## II. ISSUES PRESENTED

In their first two issues, the Amneal Parties argue that the trial court erred in denying Amneal's special appearance because (a) it did not purposefully avail itself of the privilege of doing business in Texas, (b) the Counties' claims do not arise out of or relate to Amneal's alleged contacts with Texas, and (c) the exercise of personal jurisdiction over Amneal does not comport with traditional notions of fair play and substantial justice. In their third and fourth issues, the Amneal Parties challenge the denial of API's special appearance because (a) API does not have its own contacts with Texas, (b) the Counties failed to prove that API is Amneal's alter ego, and (c) the exercise of personal jurisdiction over API does not comport with traditional notions of fair play and substantial justice.

## III. STANDARD OF REVIEW

The plaintiff bears the initial burden to plead facts bringing a nonresident defendant within reach of the Texas long-arm statute.[1] *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). The defendant may then challenge personal jurisdiction by filing a special appearance. *See* TEX. R. CIV. P. 120a. To prevail, the defendant must negate all bases of personal jurisdiction alleged. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The defendant can defeat jurisdiction on legal or factual grounds. *Id.* at 659. To defeat jurisdiction on factual grounds, the defendant can present evidence contradicting the plaintiff's factual allegations that support personal jurisdiction, and the plaintiff can respond with its own evidence. *Id.* To defeat jurisdiction on a legal basis, the defendant can show that the facts as alleged are insufficient to establish personal jurisdiction. *Id.*

---

[1] *See* TEX. CIV. PRAC. & REM. CODE §§ 178.041–.045.

3

Whether a court has personal jurisdiction over a defendant is a question of law, which we review de novo. *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023). However, jurisdiction may depend on the resolution of questions of fact. *BMC Software*, 83 S.W.3d at 794. If the trial court does not issue findings of fact and conclusions of law, we imply all facts that are supported by the evidence and necessary to support the trial court's ruling. *Id.* at 795. If the appellate record includes the reporter's and clerk's records, then the implied factual findings can be challenged for legal and factual sufficiency. *Id.* We review the trial court's legal conclusions de novo, but if the trial court's ruling on the special appearance is correct, the erroneous conclusion of law is not reversible error. *Id.* at 794.

## IV. PERSONAL JURISDICTION

Texas courts have personal jurisdiction over a nonresident defendant when the Texas long-arm statute provides for it, and the exercise of jurisdiction is consistent with federal and state due-process guarantees. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010). The long-arm statute authorizes Texas courts to exercise personal jurisdiction over a nonresident defendant "doing business" in this state. *See* TEX. CIV. PRAC. & REM. CODE § 17.042. The statute reaches "as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). To exercise personal jurisdiction over a nonresident defendant, due process requires that the defendant have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)).

4

## A. Minimum Contacts

The "constitutional touchstone" of personal jurisdiction over a nonresident is "whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quoting *Int'l Shoe Co.*, 326 U.S. at 316). The "minimum-contacts test is intended to ensure that the defendant could 'reasonably anticipate' being sued in the forum's courts." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 46 (Tex. 2016) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

A nonresident defendant's contacts with the forum state may give rise to general or specific jurisdiction. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). A trial court may exercise general jurisdiction over a nonresident defendant that has continuous and systematic contacts with the forum state, regardless of whether the defendant's alleged liability arises from those contacts. *Id.* (citing *BMC Software*, 83 S.W.3d at 796). The Counties have not alleged that Amneal and API are subject to general jurisdiction in Texas.

To exercise specific jurisdiction, (1) the defendant must have engaged in some act by which it "purposefully avails itself of the privilege of conducting activities within the forum State," and (2) the plaintiff's claims must "arise out of or relate to" those forum contacts. *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 359, 141 S. Ct. 1017, 209 L. Ed. 2d 225 (2021). Where, as here, the plaintiff alleges specific jurisdiction, we focus our minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 576. "Specific jurisdiction is established on a claim-by-claim basis unless all the asserted claims arise from the same forum contacts." *Cent. Petroleum Ltd. v.*

*Geoscience Res. Recovery, LLC*, 543 S.W.3d 901, 911 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

### 1. *Purposeful Availment*

In determining whether a defendant's contacts amount to purposeful availment, (1) only the defendant's contacts with the forum are relevant, not another person's unilateral activity; (2) the contacts must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the forum state. *Moki Mac*, 221 S.W.3d at 575.

A nonresident manufacturer or distributor seeking to serve a given state's market may subject itself to personal jurisdiction without entering the forum state "by sending its goods rather than its agents." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011) (plurality op.). But, merely placing a product into the stream of commerce is not sufficient, even if the nonresident defendant knows or can foresee that the product will end up in the forum state. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 13 (Tex. 2021). When the defendant "has no knowledge, care, or control over where a product ends up," Texas courts require additional conduct—a "plus factor"—to establish purposeful availment. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 417 (Tex. 2023). This additional conduct must evince "an intent or purpose to serve the market in the forum State." *Moki Mac*, 221 S.W.3d at 577 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (plurality op.)). To determine whether the defendant's conduct is sufficient to sustain the trial court's exercise of specific jurisdiction, we consider both "[t]he defendant's conduct and the economic realities of the market the defendant seeks to serve." *Luciano*, 625 S.W.3d at 13 (quoting *Nicastro*, 564 U.S. at 885).

## 2. *Relatedness*

For the purpose of specific jurisdiction, the plaintiff's claims "arise out of or relate to" the nonresident defendant's contacts with the forum if there is a substantial connection" between those contacts and the operative facts of the litigation. *Morgan*, 670 S.W.3d at 347. Stated differently, there must be an "'affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011) (quoting von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV. 1121, 1136 (1966)) (first alteration in original). A causal relationship is not required; the claims are sufficiently related to the defendant's forum contacts if, for example, the defendant "serves a market for a product in a State and that product causes injury in the State to one of its residents." *Ford*, 592 U.S. at 355.

## B.  Traditional Notions of Fair Play and Substantial Justice

If the minimum-contacts requirement is satisfied, only rarely will the exercise of jurisdiction fail to comport with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154 (Tex. 2013). If the defendant is the resident of another state within the United States, the factors we consider in this part of the analysis include (1) the burden on the defendant, (2) the forum state's interests in adjudicating the dispute, (3) "the plaintiff's interest in obtaining convenient and effective relief, (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the several States' shared interest in furthering fundamental substantive social policies." *Guardian*, 815 S.W.2d at 228.

7

## V. AMNEAL

In their first two issues, the Amneal Parties contend that Amneal lacked Texas contacts sufficient to support personal jurisdiction; that its alleged contacts with Texas are not related to the Counties' claims; and that the exercise of personal jurisdiction does not comport with traditional notions of fair play and substantial justice. We address each in turn.

### A.    Minimum Contacts

Amneal begins by asserting that it was undisputed in the trial court that it "has not manufactured, sold, or distributed opioid-containing products inside the State of Texas." But the Amneal Parties seem to use "inside Texas" or "within Texas" as a sort of term of art referring only to intrastate activity and excluding interstate activity. For example, when Amneal's corporate representative Andrew Boyer was asked, "Do you have employees or contracted persons whose job duties include marketing or selling opioid-containing medications manufactured by Amneal to group purchasing organizations located in Texas," he answered, "I don't have any generic employees in Texas selling to Texas, opioids or any other product." When opposing counsel clarified that he was not asking where the Amneal employees were located, Boyer answered "I don't know that we have any contracts that we're selling contracts in Texas to GPOs that are controlled substances."

But the minimum-contacts inquiry is not so restricted, for a nonresident manufacturer or distributor seeking to serve a given state's market may become subject to jurisdiction there without ever entering the forum state. *Nicastro*, 564 U.S. at 882. The defendant's transmission of goods into the forum state permits the exercise of jurisdiction if the defendant targeted the forum. *Id.*

8

To determine if the transmission of goods supports specific jurisdiction, we consider both "[t]he defendant's conduct and the economic realities of the market the defendant seeks to serve." *Luciano*, 625 S.W.3d at 13 (quoting *Nicastro*, 564 U.S. at 885). "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Nicastro*, 564 U.S. at 882. We therefore begin by looking at the Texas opioid market and determine whether Amneal's actions manifest the intention to serve that market and to submit to the authority of the State of Texas.

To explain how the opioid market is served, the Counties presented evidence from Dr. Robert B. Handfield, who is an expert in supply-chain management and has researched and taught graduate classes on the topic for over thirty-three years. He is the author of several books on the subject, including two that deal specifically with biopharmaceutical supply-chain management. He has also served as the supply-chain consultant to Cardinal Health, one of Amneal's three largest customers, who collectively comprise 90% of Amneal's sales. According to Dr. Handfield, drug manufacturers typically sell and distribute their products to a "wholesaler/distributor"—"the Big Three" being McKesson Corporation, AmerisouceBergen, and Cardinal Health—or to a chain pharmacy that serves as its own distributor, such as Walgreens or CVS. From there, the drugs are sold or delivered to a retail pharmacy, which sells and dispenses the drug to the patient.

Because most pharmacies carry only a small inventory of a wide range of drugs, they rely on wholesalers or distributors like those named above to supply and deliver on a "just-in-time" basis. To meet that need, pharmaceutical wholesalers and distributors use a nationwide network of over 200 regional distribution centers owned and operated by wholesalers and chain pharmacies. These distribution centers

are able to serve the local pharmacies in their respective geographical areas in the shortest time and for the least cost.

Amneal largely disclaimed any knowledge about the pharmaceutical supply chain. Although Boyer testified that ninety percent of its sales are to three distributors—McKesson, AmerisourceBergen, and Cardinal Health—he said that Amneal representatives call on them, respectively, in Bern, Switzerland; London, England; and Foxboro, Massachusetts, after which Amneal ships products to the location the customer specifies. Boyer denied knowing much about Amneal's products after they left the factory. He testified that he does not know how someone from a customer's distribution site would place an order. He stated that he does not know why "the Big Three" have multiple distribution centers around the country, and he is not aware that anyone at Amneal knows what geographic areas those distribution centers serve: "What they do, how they do it, why they do it, I don't know." But, Dr. Handfield pointed out that Amneal's co-CEO Chintu Patel is a pharmacist and a former senior-level manager for Eckerd Pharmacy, and thus, Amneal would know that pharmaceutical distribution areas serve the nearby geographical area. Amneal accordingly would know that drugs shipped to Texas were primarily dispensed in Texas, and perhaps in neighboring states as well.

As expected, Amneal's prescription drugs, including opioids, are in fact sold in Texas using this supply-chain network. We know this because drug manufacturers and distributors report transactions of controlled substances to the Drug Enforcement Administration (DEA) by using the "Automation of Reports and Consolidated Orders System" (ARCOS). ARCOS data from 2006 to 2014 is publicly available, and according to the Counties' experts who analyzed this data, hundreds of millions of dosage units of Amneal opioids were shipped to Texas during that time. These were sent to the regional distribution centers of "the Big Three" as well as to those

of chain pharmacies such as Walgreens and CVS and to those of chain grocery stores, such as HEB. Measured by the potency of those opioids in "morphine milligram equivalents," the majority of Amneal opioids shipped to regional distribution centers in Texas were ultimately sent to pharmacies in Texas.

Amneal maintains that this is merely fortuitous and that it just delivered the drugs where it was told to do so, and that it did not know, care, or control what happened to its products. But the evidence supports the trial court's determination that Amneal intentionally sought to serve the Texas market, and to that end, it voluntarily submitted to state's authority. To cite one example, Amneal contracts directly with H.E.B. Grocery, a Texas company with its headquarters in Bexar County. H.E.B. has no stores or pharmacies in any state other than Texas, and 100% of the opioids Amneal sent to H.E.B. were sent to H.E.B.'s distribution center in Bexar County for distribution and dispensing in Texas.

The Texas market for prescription drugs also includes millions of Texas residents who receive benefits from the state's Children's Health Insurance Program (CHIP) or state Medicaid. Pharmacists who fill prescriptions for these customers do not charge them and instead are reimbursed by those programs—but only if the specific drug that was dispensed is listed on the Texas Drug Code Index. *See* 1 TEX. ADMIN. CODE § 354.1831. A drug company that wants a product to be included in the Index must apply to the Texas Health and Human Services Commission to add the drug. *Id.* § 354.1921. Boyer testified that Amneal voluntarily applies to have all of its drugs included in the Index, because otherwise, "our customers that we sell to, our distributors, will not do business with us."

Boyer explained that Amneal's customers assume "that if you're going to bid for a product on their formulary that you will have the necessary regulatory applications filled out." And "the necessary regulatory applications" include the

11

application to the Texas Health and Human Services Commission to add the product to the Texas Drug Code Index: "What I know is that any of the customers that we do business with, that if we don't get listed on the Texas Drug Code Index they will not utilize our product." From Boyer's testimony, it is clear that if Amneal were not able to serve the Texas market, it would not have any other market in the United States: "[I]n order for us to do any business in any state with Walgreens, Walmart, Rite Aid, CVS, the wholesalers, as a course of business we need to file both federally as well as with the State of Texas." Boyer agreed that if Amneal's products were not on the Texas Drug Code Index, then Amneal "couldn't open up the market in any state" "[i]ncluding the State of Texas."

To have its products included in the Index, Amneal complied with state regulations requiring it to provide a certificate of liability insurance, to provide pricing information, and to identify the manufacturer and the distributor. Moreover, Amneal itself repeatedly has obtained a Texas license as a wholesale drug distributor.[2]

Amneal argues that these conducts should not count, because the company complies with the regulatory requirements of all of the states. But in the jurisdictional inquiry, only the defendant's contacts with the forum state are relevant. *Moki Mac*, 221 S.W.3d at 575. And if the claim at issue "arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States." *Ford*, 592 U.S. at 363 (quoting *World-Wide Volkswagen*, 444 U.S. at 363) (alterations in original). Amneal admits that it voluntarily applies to

---

[2] Although Amneal contends that it has never used such a license, the Counties presented evidence that Amneal identified itself as the distributor on the label of one of its opioid-containing drugs.

have its products included on the Texas Drug Code Index. Amneal's relationship with Texas was not created by another; rather its relationship with Texas "arise[s] out of contacts that the 'defendant *himself*' create[d] with the forum State." *Walden v. Fiore*, 571 U.S. 277, 283, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) (quoting *Burger King,* 471 U.S. at 475) (emphasis in original)). Finally, Amneal benefits from these purposefully created contacts, for none of its customers would contract with Amneal without them. As a result of these contacts, an average of more than a quarter million dosage units of Amneal opioids were sold in Texas every day from December 1, 2010, to November 2, 2022.

We conclude that the evidence supports the trial court's implied finding that Amneal's contacts with Texas satisfy the requirement of purposeful availment.

## B.    Relatedness

Amneal next contends that there is not a "substantial connection" between Amneal's alleged contacts and the operative facts of the litigation because the litigation does not arise from Amneal's "in-state conduct." According to Amneal, the Counties' claims are based on false allegations that Amneal marketed and promoted opioids to the Counties' physicians and residents.

But the Counties also alleged that its damages were caused in part by Amneal's conduct in oversupplying opioids and in failing to maintain effective systems of control against diversion. The Counties produced evidence that tens of millions of dosage units of Amneal opioids have been dispensed to Texas residents who receive Medicaid; that hundreds of thousands of each County's residents are enrolled in state Medicaid or CHIP; and that the populations served by these programs have the highest rates of overdose deaths caused by opioids. The Counties additionally produced expert evidence that, of the opioids dispensed for non-cancer chronic pain, 88% of those dispensed in Bexar County and 89% of those dispensed

13

in Dallas County were "medically unjustifiable." They contend that this oversupply caused increases in accidental overdoses, accidental deaths, harm to those with opioid-use disorder and to their families, increased health-care costs, diversion of drugs into criminal markets, and other social ills.

We conclude that the evidence supports the trial court's determination that there is a substantial connection between Amneal's Texas contacts and the operative facts of the litigation. Because all of the Counties' claims against Amneal rely on the same contacts and operative facts, we do not discuss them on a claim-by-claim basis but reach the same conclusion as to all of the claims.

## C.  Traditional Notions of Fair Play and Substantial Justice

We next determine whether this is one of the rare instances in which the exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice, even though the other jurisdictional requirements are satisfied. To do so, we examine the five factors previously discussed.

The Counties concede that the first factor—the burden on the defendant— favors Amneal.

Amneal argues that the second factor—the forum state's interests in adjudicating the dispute—favors it because it has not purposefully availed itself of the privilege of conducting activities "within Texas." We have rejected Amneal's purposeful-availment arguments for the reasons stated above. We instead conclude that this factor favors the Counties, because, *inter alia*, "Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains from products that are purposefully brought into the state and purchased by Texas companies." *Spir Star*, 310 S.W.3d at 879.

14

The third factor—the plaintiffs' interest in obtaining convenient and effective relief also favors the Counties. Not only are their causation and damage witnesses in Texas, but their cases are part of the multidistrict litigation, *In re Texas Opioid Litigation*, MDL No. 2018-63597, in which similar suits by multiple Texas counties will be heard by the same court. The multi-district litigation began in 2018, so the trial court already has years of familiarity with such cases.

Amneal argues that the fourth factor—"the interstate judicial system's interest in obtaining the most efficient resolution of controversies"—favors it because Amneal "did not undertake any activities within Texas." Again, this seems to reiterate Amneal's purposeful-availment arguments, which we have rejected. Amneal also argues that any inefficiencies in beginning the cases anew in a different jurisdiction were caused by the Counties' delay in naming Amneal as a defendant. To this, Amneal adds that the trial court's familiarity with the issues is limited to certain inapplicable (and now dismissed) allegations that the defendants promoted and advertised opioids to physicians. Nevertheless, we agree with the Counties that the most efficient resolution of the cases can be had by maintaining their status as part of the existing multidistrict litigation.

No party has addressed the fifth factor, which concerns "the several States' shared interest in furthering fundamental substantive social policies." We are unaware of a difference in the "fundamental substantive social policies" of Texas and any other state concerning the matters at issue in this case.

After considering the relevant factors, we conclude that the trial court's exercise of personal jurisdiction over Amneal comports with traditional notions of fair play and substantial justice. We overrule Amneal's first two issues, and we affirm the trial court's denial of Amneal's special appearance.

15

## VI. API

Dallas County alleged that API is a Delaware corporation with its principal place of business in New Jersey, and that, on information and belief, API is a pharmaceutical manufacturer and distributor that is licensed to do business in Texas and actually does substantial business in Texas, where it distributes pharmaceuticals to retail pharmacies and institutional providers. To this, Bexar County adds the allegation that API sells and distributes opioids in Texas "by virtue of being on the formulary for Texas Medicaid patients." Aside from these allegations of direct contacts with Texas, Bexar County also alleges that API is the managing member of Amneal and financially benefitted from its direction to Amneal to extend the sale and distribution of pharmaceuticals across the country, including Texas. From such allegations, both Counties have implied that API is Amneal's alter ego and seek to impute Amneal's Texas contacts to API.

### A. API's Contacts with Texas

In its special appearance, API first addressed the allegations that it has direct contacts with Texas. Boyer declared that API is a holding company that does not manufacture and sell prescription medications; that it has not manufactured, promoted, distributed, or sold any prescription medications inside the State of Texas; that it has no prescription medications listed on the Texas Medicaid formulary; that it is not registered with the Secretary of State to do or transact business in Texas; and that it has never had a regular place of business in Texas. The Counties did not respond to this part of API's special appearance and offered no controverting evidence that API itself has sufficient contacts with Texas to support personal jurisdiction. We therefore conclude that there is legally insufficient evidence that API has minimum contacts of its own that support personal jurisdiction. Consequently, the trial court could exercise jurisdiction over API only if Amneal's

16

contacts can be imputed to API as Amneal's alter ego. In the Amneal Parties' third and fourth issues, they argue that the Counties failed to overcome the presumption that the two companies are separate and that exercising personal jurisdiction over API would not comport with traditional notions of fair play and substantial justice.

## B.      Imputing Amneal's Contacts to API

Texas law presumes that separate companies are distinct. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). To "fuse" a parent and subsidiary for jurisdictional purposes, the parent must control the internal business operations and affairs of the subsidiary to a greater extent than that normally associated with common ownership and directorship. *BMC Software*, 83 S.W.3d at 799. To treat the two as a single entity, the evidence must show that they have "cease[d] to be separate." *Id.* The party seeking to overcome the presumption of distinctness bears the burden of proof. *Id.*

In determining whether to treat the two companies as one for jurisdictional purposes, courts may consider, *inter alia*, (1) the amount of the subsidiary's stock owned by the parent corporation, (2) the existence of separate headquarters, (3) the observance of corporate formalities, and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *PHC-Minden*, 235 S.W.3d at 175 (citing 4A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1069.4). But above all, there must be evidence that the parent exercises "abnormal" or "atypical" control over the subsidiary. *BMC Software*, 83 S.W.3d at 800 ("abnormal control"); *All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 423 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same); *PHC-Minden*, 235 S.W.3d at 176 (referring to both "abnormal control" and "atypical control"); *TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (same). "The first three factors evaluate whether corporate structure is such

that excessive control could occur, while the fourth measures actual control." *TMX Fin. Holdings*, 515 S.W.3d at 8.

To impute Amneal's contacts to API, the Counties rely on the evidence discussed below.

### 1. *Extent of Ownership*

Regarding the first factor concerning extent of ownership, the Counties rely on API's 2021 Form 10-K, in which API stated that it is a holding company whose principal asset is its 49.6% interest in Amneal. Because API holds only a minority interest, this factor does not support a determination that API is Amneal's alter ego.

### 2. *Common Address*

Regarding the second factor, the Counties correctly point out that API and Amneal have the same New Jersey address. But, shared office space is insufficient to overcome the presumption that the companies are distinct. Their common address is merely a circumstance that could lead to an abnormal degree of parental control over a subsidiary, without indicating whether such an abnormal degree of control was actually exercised. *See TMX Fin. Holdings*, 515 S.W.3d at 9; *All Star*, 298 S.W.3d at 423.

### 3. *Observance of Corporate Formalities*

As for the third factor, none of the evidence on which the Counties rely supports their assertion that "the parties do not appear to observe corporate formalities." Ultimately, that evidence shows no more than that the names of both companies begin with "Amneal Pharmaceuticals," but the fact that two companies share a common name does not affect the jurisdictional inquiry. *PHC-Minden*, 235 S.W.3d at 175.

The Counties begin by stating that, at their depositions, Boyer and Jennifer Winterhalter, Amneal's Vice President of Revenue Management, could not distinguish between Amneal and API. Boyer and Winterhalter both testified that they work for "Amneal Pharmaceuticals." Boyer stated that he is the "[e]xecutive vice president, chief commercial officer for the generic business of Amneal Pharmaceuticals," and Winterhalter testified, "I'm the vice president of revenue management with Amneal Pharmaceuticals." When asked to identify more specifically which Amneal entity was each witness's employer, neither could answer.

But as the Counties themselves pointed out in their response to Amneal's special appearance, "Amneal Pharmaceuticals" is the registered alternate name for Amneal Pharmaceuticals, LLC—the operating company that actually manufactures drugs.[3] Consistent with that, Boyer stated in his declarations in support of both Amneal's and API's special appearances that he is "the Executive Vice President, Chief Commercial Office – Generics of Amneal Pharmaceuticals LLC." Similarly, in certifying information for the Texas Drug Code Index, Winterhalter identified herself as "Vice President, Revenue Management" for "Amneal Pharmaceuticals LLC." Indeed, all of Boyer's and Winterhalter's references to "Amneal" or "Amneal Pharmaceuticals" can be traced to Amneal Pharmaceuticals LLC, and none can be traced to API.[4]

---

[3] The name is registered in New Jersey, which is Amneal's principal place of business. A New Jersey alternate name appears to be analogous to a Texas assumed name or "d/b/a." *Compare* N.J. Stat. § 42:2C-9 *with* the Texas Assumed Business or Professional Name Act, TEX. BUS. & COM. CODE § 71.001–.203.

[4] For example, Winterhalter testified that "Amneal" had contracts with several companies, and the Counties introduced the affidavit of expert witness Dr. Pengchong ("Mike") Yan that opioids were shipped to Texas locations of each of those companies by "Amneal Pharmaceuticals, LLC." There is no evidence that API had contracts with any of the companies.

The Counties also represented to the trial court that Winterhalter testified "that she did not know whether all the subdivisions were just treated as one entity, but all revenue was treated as 'Amneal's', 'regardless of which entity it comes from.'" But the actual exchange (omitting objections) was as follows:

> Q: Is there—are there multiple Amneal corporations and partnerships?
>
> . . .
>
> A: So I'm aware of multiple Amneal entities. I'm not sure if they're corporations or partnerships, or what the legal structure is.
>
> Q: Which Amneal entity do you work for?
>
> A: I honestly couldn't say. I -- I refer to Amneal as Amneal.
>
> Q: And is that the way Amneal functions, all of the entities, whatever their corporate status, are considered one entity, Amneal?
>
> . . .
>
> A: Yeah, I couldn't say in all aspects in my area. It's all revenue, regardless of which entity it comes from.

Winterhalter does not mention "subdivisions" or state how revenue is treated. There is no evidence that she manages revenue for API; in fact, there is no evidence that she performs any function at all for API or has any knowledge of API's workings. To the contrary, there is evidence in the record of at least twenty entities that begin with the word "Amneal," but there is no evidence that the "multiple Amneal entities" of which Winterhalter was aware included API. Under the equal-inference rule, neither we nor the trial court could reasonably infer that any of the witnesses' references to "Amneal" or "Amneal Pharmaceuticals" refer to API. *See All Star*, 298 S.W.3d at 423–24 (because the names of a number of affiliated entities began with the words "Antero Resources," the equal-inference rule prevented court from inferring that references to "Antero," "Antero Resources," or "Antero Resources Corp." referred to "Antero Resources Piceance Corporation").

The Counties identified no other evidence to support an implied finding that API failed to observe corporate formalities.

### 4. Extent of Control

As evidence of the fourth and most important factor—the extent to which API controls Amneal—the Counties again rely on API's 2021 Form 10-K, in which API stated, "Although [API] has a minority economic interest in Amneal, it is Amneal's sole managing member, having the sole voting power to make all of Amneal's business decisions and control its management." As the Amneal Parties point out, this statement addresses only the *power* to control Amneal's management, not the actual exercise of control. Moreover, it is not sufficient that one company exerts commercial and financial control over another, where the formalities of separateness are maintained. *Id.* at 422 (discussing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S. Ct. 250, 69 L. Ed. 634 (1925)). But as we have seen, there is no evidence to overcome the presumption that corporate formalities were observed.

We agree with the Amneal Parties that the Counties failed to overcome the presumption that API is a company separate from Amneal and not its alter ego. We sustain the Amneal Parties' third issue, and in light of our conclusion that Amneal's Texas contacts cannot be imputed to API, we do not reach the Amneal Parties' fourth issue, in which they argue that the exercise of personal jurisdiction over API does not comport with traditional notions of fair play and substantial justice.

### VII. CONCLUSION

Amneal's Texas contacts meet the "stream-of-commerce-plus" test for purposeful availment. Because the Counties' claims arise out of or relate to those contacts and a Texas court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice, we affirm the trial court's

denial of Amneal's special appearance. API, however, does not have sufficient contacts of its own to support personal jurisdiction, and the Counties failed to overcome the presumption of separateness so as to impute Amneal's contacts to API. Thus, we reverse the denial of API's special appearance, and we render judgment dismissing the Counties' claims against API without prejudice.[5]

/s/    Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Wise and Wilson.

---

[5] Although the Amneal Parties prayed for dismissal with prejudice, that disposition would function as a judgment on the merits. *Mossler v. Shields*, 818 S.W.2d 752, 754 (Tex. 1991) (per curiam). But, the merits of the Counties' claims are not before us. For the reasons stated in *Nguyen v. Desai*, 132 S.W.3d 115, 117–19 (Tex. App.—Houston [14th Dist.] 2004, no pet.), dismissal without prejudice is the appropriate relief, and although that is not the disposition prayed for, we are authorized to grant "lesser included relief." *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671 n.1 (Tex. 2008) (per curiam).